970 A.2d 921

**Andrew HEIGHT**

v.

**STATE of Maryland.**

**No. 1021, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 6, 2009.

318

320

Michael R. Malloy (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Susannah E. Prucka (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI and CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Baltimore City convicted Andrew Height, the appellant, of first-degree assault, use of a handgun in commission of a felony or crime of violence, wearing, carrying, or transporting a handgun, and possession of a regulated firearm after having been previously convicted of a disqualifying crime.[1] The court sentenced the appellant to 18 years' incarceration for first-degree assault, a concurrent ten years for use of a handgun in commission of a felony or crime of violence, a concurrent three years for wearing, carrying, or transporting a handgun, and a concurrent five years without the possibility of parole for possession of a firearm after having been previously convicted of a disqualifying crime.

The appellant presents four questions for review, which we have rephrased slightly:

I. Did the trial judge err when, in conducting *voir dire,* he posed questions to the venire collectively without obtaining answers, and then questioned each venire member individually at the bench?

II. Did the trial court err by overruling the appellant's objection to a portion of the prosecutor's opening statement that suggested a State's witness was reluctant to testify because of the "law of the street"?

---

1. The appellant was acquitted of attempted first and second-degree murder.

III. Did the trial court err by refusing to permit the cross-examination of a detective about whether he was suspended from the police force?

IV. Did the trial court err by not merging the appellant's sentences for use of a handgun in a crime of violence and wearing, carrying or transporting the same handgun?

For the following reasons, we shall vacate the appellant's sentence for wearing, carrying, or transporting a handgun, and otherwise affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On March 15, 2005, at approximately 9:45 p.m., the victim in this case, Bernard Holmstead Cure, was found near 1605 East Eager Street in Baltimore City. He had sustained a gunshot wound to the chest. Cure told Officer Andre Robinson, of the Baltimore City Police Department, that he had been shot near East Eager Street and North Madeira Street. Cure was transported to The Johns Hopkins Hospital emergency room where he repeated that information to Detective Kevin Turner.[2]

The next day, Detective Turner received a telephone call from an unnamed source suggesting that the shooting actually had occurred at the High Hat Lounge, a bar then located at 967 North Wolfe Street.[3] The High Hat Lounge was about three blocks east of where Cure was found. The intersection of East Eager and North Madeira Streets, where Cure

---

2. It is unclear what happened to Cure thereafter. He was discharged from the hospital two days after the shooting. He did not testify at trial, however. The trial court gave a missing witness instruction advising the jurors that they could draw an adverse inference if they determined that Cure's absence was not sufficiently accounted for or explained by the State.

3. The entire block where the High Hat Lounge was located subsequently was demolished.

claimed to have been shot, was about three blocks farther east of the High Hat Lounge.[4]

Detective Turner's investigation led him to speak with three witnesses: Harold Sessoms, Antoinette Calhoun, and Bernard Pratt. At trial, Detective Turner and these three witnesses testified for the State.

Harold Sessoms worked at the High Hat Lounge handling carry-out and tending bar. On March 15, 2005, he witnessed a fight between two men at the bar. In particular, he saw the appellant hit another man with a handgun. Sessoms turned away and about "three to five minutes later" heard gunshots and saw everyone run out of the bar. He did not see who was shot. When he went outside afterward, no one was there, so he did not call for an ambulance or the police. He closed up and locked the bar, but did not clean it because he was "not the clean up man." He did not see the police or anyone from the Crime Lab photographing the bar, taking fingerprints, or recovering any bullets or shell casings from the bar. Sessoms's first contact with the police about the incident was the next day, March 16, when he spoke to Detective Turner.

On March 25, 2005, ten days after the shooting, Sessoms gave a statement to the police and identified a photograph of the appellant. At trial, Detective Turner initially testified that Sessoms identified the appellant as the person who shot the victim in the bar; he clarified on cross-examination that Sessoms told him he did not see the actual shooting.

Antoinette Calhoun, an admitted drug user at the time of the shooting, was present in the small bar area of the High Hat Lounge on March 15, 2005, at around 7:00 p.m. Several people were in the bar at that time, including Cure, the shooter, the bartender, and others. Calhoun was standing near the side of the bar, next to Cure. The appellant was sitting next to Cure, and a woman named "Usa" was standing nearby. Calhoun heard Cure and the appellant arguing, and

---

4. On cross-examination, Detective Turner testified that the respective distances totaled "about seven blocks."

then saw the appellant rise up and hit Cure, apparently more than once. (Sessoms confirmed that Cure was sitting and the appellant was standing during this portion of the incident.) She then saw the appellant raise his hand, in which he was holding what appeared to be a silver gun, and heard gunshots. The fight was in progress "[l]ike a couple of seconds" before the shots were fired.

Neither Sessoms nor Calhoun testified that they actually saw the shooting. Although Sessoms heard three gunshots, he did not see who was shot. When asked whether she saw the appellant shoot the victim, Calhoun initially testified, "Let me think about that. It couldn't have been nothing else." In clarifying her response, Calhoun said, "I just seen him hit him." On cross-examination, she testified she did not see the gun being fired. When asked how many shots she heard, she replied she did not know, but that she "heard enough to leave," and that she had run out of the bar and to a friend's house.

Some days later, on March 23, 2005, after being taken into custody on drug possession charges, Calhoun gave a statement to the police. She also chose from a photographic array a picture of a person she knew as "Drew," and identified him as the man who shot Cure at the High Hat Lounge. Calhoun did not look at the photographic array for long because she "looked right at it and knew it." She handwrote on the back of the appellant's photograph, "Drew hit him and then he shot him." Detective Turner confirmed that Calhoun identified the appellant's photograph within seconds of being shown the array.

Bernard Pratt testified that he was familiar with the High Hat Lounge and had known the appellant for a few years from the neighborhood. Although he knew several people who frequented the High Hat Lounge, including Sessoms and one Ingrid Lessane, a/k/a "Usa," he did not know a person named "Bernard Cure."

After the March 15, 2005 shooting, the police spoke with Pratt, who was near the scene. At trial, Pratt testified that he

did not remember telling the police he had seen a shooting at the High Hat Lounge or that he had seen the appellant with a gun. He also did not remember seeing a photographic array in this case and denied that he was shown the array identified as State's Exhibit 3. When the prosecutor attempted to refresh Pratt's recollection with a transcript of a prior recorded statement he had made to the police, Pratt denied ever having made such a statement. The prosecutor played part of the audiotape of the recorded statement, but Pratt denied it was his voice on the recording.

According to Pratt, he was outside the High Hat Lounge on the night the shooting took place. He did not see the shooting. He did not tell the police that he saw the appellant shoot anyone or that he saw the appellant with a gun in his hand. He did not identify in court the appellant in the photographic array.

In Detective Turner's testimony, he gave an entirely different version of Pratt's police interview. The interview took place on March 23, 2005, in the Eastern District station house interview room. Detective Turner identified a transcript of the recorded statement Pratt gave that day and a copy of the photographic array shown to Pratt that day. (State's Exhibit 3.) He explained that Pratt was not mentioned by name in the statement because "he [Pratt] didn't want to give his name cause he's known in the area to a lot of the drug dealers, and the citizens, and he didn't want to be known as a snitch."

Detective Turner testified that Pratt identified a photograph of the appellant in the array and, although he did not sign the array, he wrote on the back of it, "This is Drew. He shot the boy in the bar." Detective Turner identified the audiotape of the recorded statement given by Pratt. The tape, which was the subject of a motion *in limine* outside the presence of the jury, was admitted into evidence as a prior inconsistent statement. On it, Pratt is heard to say that he had spoken with Cure inside the bar and, as they were leaving, he heard gunshots. He did not see the shooting, but he saw the appellant holding a gun in his hand afterward. On the

audiotape, Pratt also said that he had identified the appellant's photograph in the array and had written, "This is Drew. He shot the boy in the bar."

Finally, as to the State's evidence, Detective Turner confirmed that no fingerprints, bullets, shell casings, or guns were recovered in connection with this case. The parties stipulated that the appellant previously had been convicted of a crime for which he was prohibited from possessing a regulated firearm.

The defense called one witness, Ingrid Lessane, nicknamed "Usa." She testified that she knew both the appellant and Bernard Cure and that she and Cure, but not the appellant, were inside the High Hat Lounge on the evening of March 15, 2005. She was speaking with Cure when a man she did not know entered the bar, pistol-whipped Cure, and then shot him. Lessane hid behind the counter during the shooting. When it was over, she saw Cure lying on the ground and the shooter walking out of the bar.

Additional facts will be included in our discussion.

## DISCUSSION

### I.

The trial judge conducted *voir dire* in this case by reading to the entire venire panel 15 questions, without obtaining responses, and then having each venireperson come to the bench, one by one, to identify any question he or she answered affirmatively and then to answer follow-up questions, if necessary.

Before doing so, the judge explained the *voir dire* process to the venire panel, in part, as follows:

I'm going to ask all of you some questions in order to obtain certain information that will be helpful to both the attorneys and the Court in determining whether or not you are eligible to serve as jurors in this case. Your legal requirement in responding to these questions, is the same as if each of you individually took the witness stand, and testified under oath, as indeed you are under oath. As it is

impossible to question each of you individually, the questions will be asked to you as a group.

*　　*　　*　　*　　*　　*

After providing additional information about *voir dire*, the trial judge continued:

I emphasize again, that the fact that you're questioned as a group does not lessen your obligation to accurately and truthfully make known your answers in response to the questions which are to follow. The ability of this Court to obtain jurors who are free of prejudice, and who are not related to, or friends of the parties is a very important inquiry as are all of the questions that you will be asked. Now, please pay particular attention to this. I will ask these questions to you as a group in their entirety and I will not ask you to stand in response to individual questions. I will bring each of you to the bench, individually, after I have asked all of the questions, and we will take your answers to the questions at that time at the bench. So, you are not asked to stand in response to individual questions as I ask them, but please listen very carefully to all of the questions, and be prepared when you come to the bench to give us your answers at that time.

The trial judge first asked whether any member of the venire panel knew anything about the case and then asked whether any member knew any of the witnesses (reciting their names). At that point, defense counsel asked to approach the bench. He objected to the procedure of asking "the questions all as a group instead of having to stand up after each question so that we can write down the number ... [as it e]nds up being confusing to the jurors...." Defense counsel further argued that another case was pending on appeal dealing with this same issue and, therefore, "I would be objecting for the record asking if you could question and then bringing them up based on the fact that it would be confusing."[5] The court

---

5. On appeal, neither party has directed us to such a case. We are aware, however, that on February 11, 2009, the Court of Appeals

denied the request, remarking that, until the Maryland appellate courts have held otherwise, "I don't have any reason to depart from the procedure that I've adopted."

The trial judge then propounded to the entire venire 13 additional questions, ranging from whether any prospective member of the jury knew the appellant, his attorneys, or the prosecutor, to whether any prospective juror or member of his or her immediate family had been a victim or convicted of a crime, and finally to whether there was any reason any prospective juror could not render a fair and impartial verdict based on the evidence and the law. Thereafter, the judge directed counsel to the bench, and ascertained that, with the exception of the previous objection, there was no further objection to the *voir dire* process at that point.

The trial judge commented to counsel:

> Let me just say that I think asking the questions as a group, being limited in number, my experience has been that they do remember the questions. Most of the folks don't want to be here for one reason or another, and they come up, and give very fulsome answers to the questions to which they have responses, and the practice of having folks stand and taking numbers is itself distracting, and quite frankly, in my opinion, it educates other potential jurors of reasons or excuses by which they might avoid serving for reasons that may or may not be genuine. So, quite frankly, I don't do this as a way of expediting the process. I do it because I think it's a fairer way to get at the issue of bias and prejudice without causing the group as a group to educate, self-educated self [sic] without reasons they may achieve in being excused from service.

---

granted *certiorari* in *Wright v. State,* 407 Md. 276, 964 A.2d 675 on the issue: "Did the lower court correctly conclude that the trial court properly exercised its discretion in its *voir dire* procedure?" The *voir dire* procedure at issue in *Wright* is the same procedure at issue here, and applied by the same trial judge. A panel of this Court affirmed the judgments in *Wright* in an unreported opinion. *Wright v. State,* 182 Md.App. 749 (2008).

So, in addition to your objection which is noted on the record, I wanted to be perfectly clear on the record why after consideration at this point with a good amount of experience with the process, I'm convinced that this is a very effective way of conducting voir dire for the purposes that the Court has described. . . .

The trial judge next heard from each prospective juror individually at the bench.[6] The colloquy typically involved an initial question from the judge whether the prospective juror had any positive responses to the questions, followed by a discussion of the juror's responses, if any, and concluding with the judge asking if there was any reason the prospective juror could not be fair and impartial and reach a verdict based on the evidence and the law. The judge ruled on challenges by counsel throughout and also at the end of the entire process. The judge liberally granted strikes for cause and only did not ask a final "fair and impartial" question to prospective jurors who clearly were going to be stricken for cause (and then were). At the conclusion of the *voir dire,* the parties proceeded to select a 12–member jury and two alternates, all of whom the State and defense counsel indicated were acceptable.

The appellant contends the trial judge's mode of stating the 15 questions to the entire venire collectively, without having the individual members stand, after each question, to give any affirmative response, "prevented [the prospective] jurors from being able to accurately and appropriately respond to all of the questions posed by the Court." Although he does not cite any specific example, he argues that the process used by the court "likely caused some, if not all, of the jurors to forget some of the questions and, critically, their corresponding answers to those questions." He further argues that the court compounded its error by asking potential jurors whether they had any additional information to provide in response to the

---

**6.** Although the transcript does not provide juror numbers, it reveals that 85 jurors were questioned individually at the bench by the trial judge. This corresponds with the prospective jurors listed on the jury panel roster that is in the record, less one juror sent back to the jury room prior to the start of *voir dire.*

court's questions, thus shifting the burden of determining impartiality away from the court, in violation of the holding of *Dingle v. State*, 361 Md. 1, 759 A.2d 819 (2000).

■ The State responds that the appellant "distorts the actual process by which *voir dire* was conducted" in this case and "neglects to mention that each individual venire member was brought before the bench." It further responds that *Dingle* is distinguishable and that, here, the trial judge did not abdicate to the prospective jurors his role in determining whether they could be fair and impartial. We agree with the State and hold that the trial judge properly exercised discretion in conducting *voir dire* in the instant case.

■ The right to an impartial jury is guaranteed by the Sixth Amendment of the United States Constitution as made applicable to the States through the Fourteenth Amendment, and Article 21 of the Maryland Declaration of Rights. *Stewart v. State*, 399 Md. 146, 158, 923 A.2d 44 (2007); *Hunt v. State*, 345 Md. 122, 146 n. 9, 691 A.2d 1255 (1997); *Boyd v. State*, 341 Md. 431, 435, 671 A.2d 33 (1996), *overruled on other grounds by Owens v. State*, 399 Md. 388, 924 A.2d 1072 (2007);; *Hill v. State*, 339 Md. 275, 280, 661 A.2d 1164 (1995). The *voir dire* procedure exists to ensure juror impartiality, or stated another way, " 'to ascertain "the existence of cause for disqualification." ' " *Boyd*, 341 Md. at 435, 671 A.2d 33 (quoting *Hill*, 339 Md. at 279, 661 A.2d 1164); *accord Stewart*, 399 Md. at 158, 923 A.2d 44.

■ As there is no statute in Maryland governing either the procedure for or the questions to be asked on *voir dire*, "this Court has consistently looked to Maryland's common law for guidance." *Davis v. State*, 333 Md. 27, 34, 633 A.2d 867 (1993). Under Maryland common law, " 'the scope of *voir dire* and the form of the questions propounded rest firmly within the discretion of the trial judge.' " *Boyd*, 341 Md. at 436, 671 A.2d 33 (quoting *Davis*, 333 Md. at 34, 633 A.2d 867); *accord White v. State*, 374 Md. 232, 241, 821 A.2d 459 (2003); *Dingle, supra*, 361 Md. at 13, 759 A.2d 819; *Uzzle v. State*, 152 Md.App. 548, 558, 832 A.2d 869 (2003) (stating that "Maryland

has adopted and continues to adhere to, limited *voir dire* ")
(emphasis omitted).

■ Maryland adheres to limited *voir dire* under the broad
discretion of the trial court.[7] "The scope of *voir dire* and the
form of questions propounded rest firmly within the discretion
of the trial judge." *Stewart, supra,* 399 Md. at 159, 923 A.2d
44. "We review the trial judge's rulings on the record of the
*voir dire* process as a whole for an abuse of discretion, that is,
questioning that is not reasonably sufficient to test the jury
for bias, partiality, or prejudice." *Id.* at 160, 923 A.2d 44; *see
also White, supra,* 374 Md. at 243, 821 A.2d 459; *Dingle,
supra,* 361 Md. at 13, 759 A.2d 819.

*Voir dire* in criminal cases is covered by Rule 4–312(d),[8]
which states in relevant part:

The court may permit the parties to conduct an examina-
tion of prospective jurors or may itself conduct the examina-
tion after considering questions proposed by the parties. If
the court conducts the examination, it may permit the
parties to supplement the examination by further inquiry or
may itself submit to the jurors additional questions pro-
posed by the parties.

This Court has acknowledged that, although Rule 4–312(d)
does not specifically address whether prospective jurors are to
be questioned individually or collectively, *see Davis v. State,* 93
Md.App. 89, 106, 611 A.2d 1008 (1992), the rule is "couched in
permissive terms." *Wooten–Bey v. State,* 76 Md.App. 603,
621–22, 547 A.2d 1086 (1988). Thus, it has been held consis-

---

7. That broad discretion is tempered by a series of cases in which the
Court of Appeals and this Court have mandated that certain questions
be asked whenever generated by the facts of the case. *Dingle, supra,*
361 Md. at 10 n. 8, 759 A.2d 819; *Curtin v. State,* 165 Md.App. 60, 68,
884 A.2d 758 (2005), *aff'd,* 393 Md. 593, 903 A.2d 922 (2006). None of
these exceptions to the trial court's broad discretion are implicated in
the present case.

8. Rule 4–312 was amended effective January 1, 2008. The 2008
volume of the Rules contained the previous version of the Rule, which
is quoted above. This subsection differs from the current version only
stylistically.

tently that there is nothing improper about a trial judge's questioning prospective jurors as a group; the judge may question them either as a group or individually. *Barber v. State,* 16 Md.App. 235, 241, 295 A.2d 814 (1972). *See also Bedford v. State,* 317 Md. 659, 671, 566 A.2d 111 (1989) ("[W]here it is shown that no prejudice will result, questions during *voir dire* may be propounded to Maryland jurors collectively, rather than separately."); *Connor v. State,* 225 Md. 543, 549–50, 171 A.2d 699 (1961).

Indeed, the Court of Appeals has observed that "collective juror questioning long has been standard practice in Baltimore City." *Bedford,* 317 Md. at 671, 566 A.2d 111 (citing *Connor, supra,* 225 Md. at 549, 171 A.2d 699). In *Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984), in which the petitioner argued that individualized *voir dire* was required in a capital case, the Court stated:

> [N]o authority has been brought to the attention of this Court, nor have we found any, mandating individual *voir dire* under any circumstances. To the contrary, as appellant concedes, in the absence of a statute or court rule to the contrary, as long as the selection process results in a fair and impartial jury, the method and manner of conducting a *voir dire* rests within the sound discretion of the trial court.

*Id.* at 102, 472 A.2d 953.

The *voir dire* method employed by the trial judge in this case was not a "rushed" process that interfered with the appellant's jury selection rights, so as to have amounted to an abuse of discretion. Before posing his questions to the entire venire panel, the trial judge told them he would be discussing their answers with them individually, at the bench, and reminded them to listen and remember the questions they had positive answers to. The judge then conferred one-on-one with each prospective juror (and with counsel) about his or her answers. There is nothing in the record to suggest that any of the prospective jurors forgot any of the questions posed, or were likely to have forgotten them. Not a single prospective

juror said anything at the bench about not remembering questions or answers or being confused by the questions. And the trial judge's stated reason to counsel for not having the panel members answer the questions before the entire venire, only then to be interviewed individually by the court, made sense: He did not want prospective jurors angling for excuses based on excuses they noticed were working for other panel members.

We further disagree with the appellant's argument that the *voir dire* process employed here violated *Dingle, supra,* by "improperly shift[ing] the burden of deciding if jurors could be fair and impartial from the court to the jurors themselves." In *Dingle,* the trial judge posed compound questions to the prospective jurors. The second part of each question asked the jurors whether, if they answered the first part of the question affirmatively, they still could be fair and impartial in deciding the case. Only when a juror had answered (to himself) both parts of a question was he then to answer affirmatively to the court. The Court of Appeals found this method of inquiry deficient because the trial judge did not "determine, in the final analysis, the fitness of the individual venire persons." *Dingle,* 361 Md. at 8, 759 A.2d 819. It was apparent that the trial judge in *Dingle* did not want to know any of the underlying reasons why a prospective juror stood in the first place because the court stated "[a]gain, ladies and gentlemen, if you'd please simply answer the question without elaborating, it would be very helpful." *Id.* at 6, 759 A.2d 819.

The specific problem in *Dingle* was the inherent ambiguity in the compound question, which necessarily resulted in a corresponding ambiguity in the jurors' responses. The ambiguity made it impossible for the trial court to distinguish prospective jurors who did not have the potentially disqualifying association from those who did but nevertheless believed in their own minds that they could be fair and impartial. The Court explained:

> Expediency and the perceived need to limit the process ... led the [trial] court to find a way to avoid examination of each affected venire person as to the admittedly relevant

matters and allow each such person to make his or her own call as to his or her qualification to serve.

*Id.* at 14, 759 A.2d 819.

The Court of Appeals later elaborated on its holding in *Dingle,* stating:

The standard for evaluating a court's exercise of discretion during the *voir dire* is whether the questions posed and the procedures employed have created a reasonable assurance that prejudice would be discovered if present. The disapproved *Dingle*-type questions, *standing alone,* would constitute reversible error. *See Dingle,* 361 Md. at 21, 759 A.2d at 830. As we made clear in *Dingle,* the use of the compound question permits a juror to self-assess whether that juror could be fair and impartial. *Id.* at 19, 759 A.2d at 828–29. It is the responsibility of the trial judge, not the juror, to make the final determination as to whether the juror can be impartial.

*White,* 374 Md. at 242, 821 A.2d 459; *see also Borchardt v. State,* 367 Md. 91, 138–39, 786 A.2d 631 (2001) (the evil that *Dingle* sought to address was the fact that the compound questions at issue "left to the jurors themselves, and thus removed from the court, the assessment of whether they could be fair and impartial").

In *White, supra,* the Court rejected an argument that a trial judge's use of compound questions during *voir dire* examination had prevented empaneling a fair and impartial jury. The judge had asked general *voir dire* questions of the entire venire panel, including four compound questions, and then had conducted individual *voir dire* of each venire person at the bench. After noting that trial judges should refrain from asking compound questions during *voir dire,* and also reaffirming that in Maryland individual *voir dire* is not required, *see White,* 374 Md. at 242–43, 821 A.2d 459, the Court held that, considering the *voir dire* as a whole, the extensive examinations of the prospective jurors ensured "that the jurors chosen would be free from any preconceptions, biases, or

prejudices which might interfere with their ability to be fair and impartial jurors." *Id.* at 244, 821 A.2d 459.

This case is more like *White* than *Dingle*. The questioning of the prospective jurors was thorough and designed to ensure that the jury chosen would be fair and impartial. Each prospective juror was brought to the bench and asked if he or she had any positive response to any of the questions the court had propounded; if so, the court engaged the prospective juror in a discussion designed to determine whether he or she could be fair and impartial. Unlike in *Dingle*, there were no compound questions asked that resulted in the prospective jurors themselves deciding whether they were qualified to serve, instead of the trial court so deciding. The trial court properly exercised discretion in conducting *voir dire* examination in this case.

## II.

The appellant next contends the trial court erred by overruling his objection to the prosecutor's remark in opening statement that one of the State's witnesses was reluctant to testify because of "the law of the street." He maintains that the prosecutor's comment was improper under the holding in *Lee v. State*, 405 Md. 148, 950 A.2d 125 (2008). The State responds that this issue was not timely preserved and is without merit in any event.

The comment in question concerned the anticipated testimony of Bernard Pratt. The prosecutor stated in opening:

Finally, you're going to hear from Bernard Pratt who was also there that night. Quite frankly, I expect Mr. Pratt to be difficult on the stand because I know he doesn't want to testify. See, Mr. Pratt is also in jail on his own separate charges. He doesn't follow the same laws that you and I do. The law that's recognized in this courtroom. *He follows the law of the street. Rule number one on the street is you do not snitch.*

So, I expect him to get up there and I don't know what he's going to say. I didn't see nothing. I didn't hear

nothing. I wasn't there, but it doesn't matter, ladies and gentlemen, because shortly after this incident, Mr. Pratt gave a taped statement to the detectives. He told detectives what happened that night. *I submit to you that the only reason that he doesn't want to testify in this trial is because he doesn't want to be labeled as a snitch at this point.*

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Those are the three witnesses that you will hear from. All three of these witnesses gave statements, were presented with photographic arrays, and identified the Defendant as the person who shot Bernard Cure, all three of them.

(Emphasis added.)

■ First we shall address preservation. The State, citing Rule 8–131(a) and *Bates v. State*, 127 Md.App. 678, 736 A.2d 407 (1999),[9] contends the appellant's objection was untimely, and thus he is precluded from arguing a violation of *Lee*. We disagree.

In *Bates*, the co-defendants failed to object *at any time* to the prosecutor's allegedly improper closing argument. *Id.* at 703, 736 A.2d 407 ("Defense counsel neither objected when the argument was made nor at any later point. Counsel did not request a mistrial or a curative instruction. Thus, the matter was never presented to the trial court and clearly is not preserved."). Moreover, in *Grier v. State*, 116 Md.App. 534, 698 A.2d 1133 (1997), *overruled on other grounds*, 351 Md. 241, 718 A.2d 211 (1998), we addressed this same issue, in the context of closing argument:

We shall continue to hold that objections to improper argument are timely if interposed either (1) immediately after the allegedly improper comments are made, or (2) immediately after the argument is completed. We shall

---

**9.** *Bates* was overruled on other grounds, *Tate v. State*, 176 Md.App. 365, 933 A.2d 447 (2007), *vacated*, 405 Md. 106, 950 A.2d 100, *aff'd on remand*, 182 Md.App. 114, 957 A.2d 640 (2008).

decline, however, requests to review "improper argument" objections that were not presented to the trial judge until after the jurors have been excused from the courtroom. 116 Md.App. at 545, 698 A.2d 1133. Therefore, the appellant's objection was timely and we shall address the merits of his argument.

In *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974), a case concerning both opening statement and closing argument, the Court of Appeals set forth the following general rule with respect to opening statements by prosecutors in jury trials of criminal cases:

> The primary purpose or office of an opening statement in a criminal prosecution is to apprise with reasonable succinctness the trier of facts of the questions involved and what the State or defense expects to prove so as to prepare the trier of facts for the evidence to be adduced. While the prosecutor should be allowed a reasonable latitude in his opening statement he should be confined to statements based on facts that can be proved and his opening statement should not include reference to facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. An opening statement by counsel is not evidence and generally has no binding force or effect. *To secure a reversal based on an opening statement the accused is usually required to establish bad faith on the part of the prosecutor in the statement of what the prosecutor expects to prove or establish substantial prejudice resulting therefrom.*

272 Md. at 411–12, 326 A.2d 707 (emphasis added); *see also Allen v. State*, 318 Md. 166, 178–79, 567 A.2d 118 (1989) (The purpose of opening statement "is to inform the trier of facts of the issues involved and what evidence will be offered as proof to resolve those issues."); *Calhoun v. State*, 297 Md. 563, 596, 468 A.2d 45 (1983) ("It is not the purpose of an opening statement to argue the merits of the case or to discuss the pertinent law.").

Further:

Although the purpose of an opening statement is to apprise, with reasonable succinctness, the trier of facts of the questions involved and what is expected to be proven, such opening statement does not need to be limited to a factual recitation of what is expected to be elicited from the prospective witnesses. Counsel are entitled to make what rhetoricians call an exordium—that part of the opening intended to make the listeners heed you and to prepare them for that which is to follow. We do not mean to suggest that the performing artists be given a "broad range" in their efforts at advocacy. Each case must depend upon its own peculiar facts and both counsel—for the prosecution as well as for the defense—are enjoined in their eloquence to circumspection, lest in their enthusiasm for their cause they create a condition which is likely or apt to instigate prejudice against the accused—or the prosecution.

*Wilhelm*, 272 Md. at 437–38, 326 A.2d 707 (footnote omitted).

■■ The trial judge is in the "most advantageous position to evaluate any potential prejudice" from a remark made in opening statement, and a reviewing court "must give due weight to the conclusion of the trial judge who witnessed the presentation and heard the actual remarks—in the context in which they were made, in the trial arena—and who found no prejudice." *Wilhelm* at 436–37, 326 A.2d 707. And, " '[e]ven if the prosecutor's statement during opening ... was, in fact, improper, the record must compellingly demonstrate sufficient prejudice to warrant granting [a mistrial].' " *Miles v. State*, 88 Md.App. 360, 388, 594 A.2d 1208 (1991) (quoting *Leak v. State*, 84 Md.App. 353, 358, 579 A.2d 788 (1990)).

In *Wilhelm*, the defendant was convicted of assault with intent to murder a police officer, resisting arrest, and unlawful use of a handgun in the commission of a felony. In opening statement, the prosecutor said, " 'The State feels this is the Jury's chance as individuals and collectively as citizens of Baltimore County—we hear the hue and cry of police protection—we feel this is your occasion to do something about it.' " *Wilhelm*, 272 Md. at 407, 326 A.2d 707 (emphasis omitted).

The defendant objected and requested a mistrial, but that request was denied. This Court affirmed in an unreported opinion, suggesting that the remark may have been improper but had been unlikely to mislead the jury. The Court of Appeals affirmed, giving due weight to the trial judge's finding of no prejudice. The Court observed that the remark was "but one sentence in the extensive proceedings, singularly made and unrepeated." 272 Md. at 436, 326 A.2d 707. The Court then stated:

> The trial judge was in the most advantageous position to evaluate any potential prejudice from the remark; by his ruling he found none. If in the trial environment he had sensed the likelihood of any prejudice he would have carried out the duty with which he was entrusted . . . and of which he was certainly aware—to instruct the jury to disregard such remark; the exigencies of the situation did not appear to him to require such a cautionary instruction. We agree.

*Id.* at 436–37, 326 A.2d 707 (citation omitted).

■ Similarly, in the case at bar, the prosecutor's "law of the street" remark in opening statement was an isolated comment about a reluctant witness. The trial judge was in the best position to gauge whether that remark, or, for that matter, the reference to Mr. Pratt as a "snitch," was likely to unfairly prejudice the appellant.

Moreover, this case is factually distinguishable from the recent case of *Lee v. State*, 405 Md. 148, 950 A.2d 125, on which the appellant relies. *Lee* concerned remarks by the prosecutor in rebuttal closing argument in a jury trial in Baltimore City. The defendant had been charged with attempted first-degree murder and related offenses. At trial, a State's witness testified that on the day in question she had heard gunshots and then had seen Lee, carrying what appeared to be a smoking gun (literally), chasing the intended victim, Richard Cotton, up a street. The State did not call Cotton as a witness.

Lee called Cotton as a defense witness. Defense counsel elicited from Cotton that he (Lee) was not the shooter.

In closing argument, defense counsel urged the jurors to disbelieve the State's witness and instead believe Cotton. Further, defense counsel argued that the reason the State did not call Cotton as a witness was because "[t]hey don't like what he had to say. They made no effort to bring him in," and there was no evidence that Cotton was lying. 405 Md. at 155, 950 A.2d 125. In rebuttal closing, and over objection, the prosecutor argued that the jurors should not believe Cotton's testimony because he was an untruthful witness who was following the "law of the streets." The prosecutor further argued that Cotton was not interested in helping police and that he knew who shot him, but the case was not about "his law" or the "law that he follows, . . . the justice that he seeks." *Id.* at 157, 950 A.2d 125. The prosecutor continued her exhortations, reminding the jury that she was representing the citizens of Baltimore City who have a right to be safe in their neighborhoods, and "ask[ing] that you teach this defendant . . . that disputes aren't settled by the blast of a gun." *Id.* Defense counsel made timely objections.

The trial judge admonished the jurors not to decide the case based upon appeals to passion or prejudice. He permitted the prosecutor to continue to say, over repeated objection, that the residents of Baltimore "want justice, even if Richard Cotton doesn't." *Id.* at 157–58, 950 A.2d 125. The prosecutor completed her rebuttal closing argument by again repeating the phrase "law of the streets" and asking the jurors to teach Lee a lesson not to settle disputes with violence.

Lee was convicted of first-degree assault, use of a handgun in the commission of a felony or crime of violence, and related counts. Ultimately, the Court of Appeals reversed on the ground that the "cumulative effect" of the prosecutor's closing rebuttal argument "was sufficiently prejudicial to deny Lee a fair trial." *Id.* at 160, 950 A.2d 125. It explained that the remarks fell into three groups: the assertion that Cotton was not credible because he was following the "law of the streets"; the assertion that the jurors should protect their community; and, finally, the use of the phrase the "law of the streets" to

suggest that the jurors should teach Lee a lesson about resolving disputes.

In discussing the first of these three types of remarks, the Court noted the general rule that comments by counsel in closing argument that invite jurors to draw inferences from information not admitted into evidence at trial are improper. In *Lee*, there was nothing in the evidence to show what the "law of the streets" meant in the context of that case. Because the jury would have to speculate as to the meaning of the phrase, a majority of the Court deemed the comments to be improper.

The Court further concluded that the prosecutor's plea that the jurors protect the citizens of Baltimore from criminals was a prohibited "golden rule" argument, *i.e.*, "one in which a litigant asks the jury to place themselves in the shoes of the victim, or in which an attorney appeals to the jury's own interests." *Id.* at 171, 950 A.2d 125 (citing *Lawson v. State*, 389 Md. 570, 593 n. 11, 886 A.2d 876 (2005), and *Hill v. State*, 355 Md. 206, 214–15, 734 A.2d 199 (1999)). The Court explained:

> In asserting that the jurors should consider their own interests and those of their fellow Baltimoreans, and should clean up the streets to protect the safety of their community, the State clearly invoked the prohibited "golden rule" argument. Essentially, the State was calling for the jury to indulge itself in a form of *vigilante justice* rather than engaging in a deliberative process of evaluating the evidence.

*Lee*, 405 Md. at 172–73, 950 A.2d 125 (footnote omitted).[10]

Finally, the Court also found improper the prosecutor's invocation of the "law of the streets" terminology to suggest that the jurors teach Lee a lesson not to settle disputes with

---

**10.** The concurring opinion disagreed that the comments regarding the "law of the streets" were either improper or likely to mislead, but concurred with the ultimate outcome on the ground that the prosecutor's improper "golden rule" argument created reversible error. *Lee*, 405 Md. at 181–84, 950 A.2d 125 (Harrell, J., concurring).

violence. The Court reiterated there was nothing in the record from which the jurors could derive what was meant by that phrase, and so they were left to speculate as to its meaning. The Court concluded that, taken together, the cumulative effect of the prosecutor's improper comments in closing was unfairly prejudicial and the appropriate remedy was a new trial.

The distinctions between *Lee* and the case at bar are significant. Here, the prosecutor used the "law of the street" terminology once, during opening statement. It was not thereafter repeated. This simply is not akin to the cumulative commentary by the prosecutor in closing argument that the *Lee* Court found to have been prejudicial. In addition, the purpose of an opening statement is to forecast evidence that is expected to be admitted at trial, not, as it is in closing argument, to summarize and explain the facts in evidence. In using the "law of the street" phrase in opening statement, the prosecutor explained that that meant "[r]ule number one on the street is you do not snitch." "Snitch" is commonly understood slang for "to turn informer; tattle." *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, p. 1808 (2d. ed., unabr., 1987). The prosecutor defined the "law of the street" reference in opening statement to mean "snitching" and offered it to forecast for the jurors that Bernard Pratt would be a reluctant witness who would not willingly testify in support of the State's case. That forecast was borne out at trial: Pratt was an obviously unhelpful witness for the State and, according to Detective Turner, his name was left out of his recorded statement because "he didn't want to give his name cause he's known in the area to a lot of the drug dealers, and the citizens, and he didn't want to be known as a snitch."

The prosecutor did not speak improperly by using the "law of the street" phrase, which he equated to "snitching," to predict how the evidence likely would unfold. And, unlike in *Lee*, he did not use the phrase to unfairly generate passion against the appellant or to appeal to the jurors to convict in order to make the streets safe or to teach a lesson. He

merely used it to explain what he expected would happen when Pratt was called to testify, which indeed happened.

Finally, we also note that, prior to opening statements, the court gave preliminary instructions informing the jury that opening statements are not evidence and are "for the purpose of outlining for [the jurors] what [the attorneys] expect the evidence to show in this case." The court further instructed the jurors prior to opening statements that the attorneys could not "make an improper comment in an effort to persuade you to abandon your role as impartial judges of the fact, facts. Your sole interest in this case is to return a just verdict." At the end of the case, the court instructed the jurors that opening statements and closing arguments are not evidence, and are intended only to help them understand the evidence and the law, and that, "if your memory of the evidence differs from anything the lawyers or I may say, you must rely on your own memory of the evidence."

The trial court did not abuse its discretion by overruling the appellant's objection to the prosecutor's opening statement.

## III.

■ The appellant next argues that the trial court erred by limiting his cross-examination of Detective Turner about whether he was on suspension from the police force. The appellant maintains that this inquiry was relevant to the witness's credibility and because it established that the witness was under "pressure to testify favorably for the State." The State responds that the appellant did not offer a reasonable factual basis to support the allegation of misconduct and that "the pending disposition of another unrelated, administrative matter did not indicate any present pressure to testify favorably for the State." We hold that the trial court properly exercised its discretion in the present case.

■ The Confrontation Clause of the Sixth Amendment guarantees an accused in a criminal proceeding the right "to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *accord Pantazes v. State,* 376 Md. 661, 680, 831 A.2d 432 (2003). This same right is guaranteed to a criminal defendant by Article 21 of the Maryland Declaration of Rights. *Simmons v. State,* 333 Md. 547, 554–55, 636 A.2d 463 (1994). "The constitutional right of confrontation includes the right to cross-examine a witness about matters [that] affect the witness's bias, interest or motive to testify falsely." *Marshall v. State,* 346 Md. 186, 192, 695 A.2d 184 (1997); *accord Pantazes,* 376 Md. at 680, 831 A.2d 432.

However, "[t]he right to cross-examine is not without limits . . . and 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990) (quoting *Van Arsdall, supra,* 475 U.S. at 679, 106 S.Ct. 1431); *accord Pantazes,* 376 Md. at 680, 831 A.2d 432; *Lyba v. State,* 321 Md. 564, 570, 583 A.2d 1033 (1991); *Churchfield v. State,* 137 Md.App. 668, 683, 769 A.2d 313 (2001).

In the case *sub judice,* near the beginning of cross-examination, Detective Turner was asked whether he was currently suspended. The prosecutor objected and, at a bench conference, argued the question was inappropriate and the appellant's trial counsel was "merely speculating and it should have been done in a motion before trial." After the court suggested defense counsel give a "very good proffer," defense counsel argued:

> They definitely are currently suspended. The State's Attorney knows it. It was in the Baltimore Sun that they were all suspended and I told the State's Attorney a long time ago that I was going to mention that he was suspended.

The court then asked defense counsel to explain how the suspension was relevant to the witness's credibility. The following ensued:

[DEFENSE COUNSEL]: It does. It goes to his training and expertise. If he is now currently suspended, then his training and expertise, his qualifications, and one of the things that he is under suspension goes to his credibility. He is suspended for making a false [sic] on his overtime and over—misreporting his overtime which goes to his [veracity] and credibility.

THE COURT: Has there been any findings with respect to that charge, ma'am?

[DEFENSE COUNSEL]: No, there hasn't.

THE COURT: Why would the suspension be relevant if there's been no finding whatsoever with regard to the charges?

[DEFENSE COUNSEL]: Because currently right now, he is not an active member of the Police Department. He doesn't have police powers and obviously that that goes to his credibility.

THE COURT: Why? If there's no sustained finding with regard to the charges that have been made, why would that be at all relevant?

[DEFENSE COUNSEL]: Because his own department has felt that he isn't credible enough to be a member of the Police Department at the moment. So, I think it definitely goes to his credibility.

THE COURT: I disagree. (Inaudible). Objection is sustained.

[PROSECUTOR]: Your Honor, at this time, I'm going to make a Motion for Mistrial. I think it's highly prejudicial to—

THE COURT: I will give an instruction. You can listen to it and then if you want to renew your Motion for Mistrial, I'll consider it.

[DEFENSE COUNSEL]: Thank you.

THE COURT: Thank you.

( [Whereupon], counsel and Defendant returned to trial tables and the following ensued:)

THE COURT: Ladies and gentlemen, I have sustained the objection to the previous question. It has absolutely no [bearing] whatsoever on this case. It ought not to have been asked. You are to disregard it. It is irrelevant in all respects to this case and you will give it no consideration, whatsoever . . . .

The issue presented turns on an interpretation of Rule 5–608(b), which provides:

(b) **Impeachment by examination regarding witness's own prior conduct not resulting in convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

■■■ As the Court noted in *Pantazes,* 376 Md. 661, 831 A.2d 432,

Rule 5–608 (b) codified the common law rule and [the] holdings in *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983) and *Rau v. State,* 133 Md. 613, 105 A. 867 (1919) (holding that defendant may not offer extrinsic evidence to support allegations of past false accusations).

*Id.* at 683, 831 A.2d 432. Pursuant to the rule, a witness may be cross-examined about prior acts that are probative of untruthfulness, however, "the questioner is bound by the witness' answer and may not introduce extrinsic evidence of the asserted conduct." *Id.* at 686–87, 831 A.2d 432.

Professor McLain has explained:

Maryland courts traditionally have been reluctant to allow impeachment by proof of prior bad acts that did not result

in conviction—unless they were specific acts of untruthfulness. The law of Maryland has been clear that a witness may not be impeached by others' accusations or others' statements of the witness' misconduct, including arrests, indictments or criminal charges not resulting in conviction. The rationale given for the holdings in those cases was in part the hearsay nature of the accusation. It also was in part that the courts feared that undue prejudice and humiliation would result from cross-examination of a witness about such acts, especially because, absent a conviction, there might be little chance that the witness had committed the act. The courts also recognized that the introduction of the question whether the witness had committed the act was likely to distract the jury from the operative issues in the case.

McLain, *Maryland Evidence,* § 608:1, 471–75 (2001) (footnotes omitted); *see also Cox, supra,* 298 Md. at 178–80, 468 A.2d 319 (proof of certain prior bad acts affecting witness credibility should not always be precluded, and trial court must balance the probative value of the inquiry against the potential prejudice to the witness); Murphy, *Maryland Evidence Handbook,* § 1302(C), 503–04 (3d ed.1999) ("counsel should be prohibited from asking the question unless he is able to proffer enough information that the trial judge could consider the misconduct sufficiently reliable to be considered against the witness if the witness were being sentenced").

In this case, the trial judge questioned whether Detective Turner's suspension could be relevant to his credibility as a witness if there was no finding against him on the underlying charge. Under these circumstances, we agree that the trial court properly could have determined there was no reasonable factual basis to support impeachment. *See Pantazes,* 376 Md. at 688, 831 A.2d 432 (whether there is a reasonable factual basis for the allegation of prior bad conduct is within the trial court's discretion). Mere accusations of misconduct, even an arrest or an indictment, have little probative value, because "when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of

misconduct by some other person, but whether the witness actually committed the prior bad act. A hearsay accusation of guilt has little logical relevance to the witness' credibility." *Cox,* 298 Md. at 181, 468 A.2d 319.

> The rationale for this viewpoint is obvious. First of all, accusations of misconduct are still clothed with the presumption of innocence and receiving mere accusations for this purpose would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay.

*Id.* at 180, 468 A.2d 319 (citations omitted) (stating that the relevant inquiry is whether the witness actually committed the prior bad act); *accord Taylor v. State,* 407 Md. 137, 963 A.2d 197 (2009); *see also Robinson v. State,* 298 Md. 193, 200, 468 A.2d 328 (1983) ("if the bad acts are not conclusively demonstrated by a conviction, the trial judge must exercise greater care in determining the proper scope of cross-examination"). *Cf. Mulligan v. State,* 18 Md.App. 588, 594–95, 308 A.2d 418 (1973) (testimony that a police officer was found guilty of falsifying official reports of the Baltimore City Police Department should have been the subject of consideration by the jury).

Here, the appellant presented the trial court with a mere allegation of misconduct against Detective Turner. Absent a mini-trial on the issue, there was no reasonable factual basis for asserting that the untruthful conduct of the witness occurred, as opposed simply to the mere possibility of untruthfulness.

Finally, on this issue, the appellant argues that the mere accusation of misconduct was relevant to show that Detective Turner was somehow "under pressure to testify favorably for the State." This argument does not appear to have been made below, and therefore is not properly before us. *See* Md. Rule 8–131(a); *accord Robinson v. State,* 404 Md. 208, 216, 946 A.2d 456 (2008); *see also Colvin-el v. State,* 332 Md. 144, 169, 630 A.2d 725 (1993) ("Appellate review of an evidentiary ruling, when a specific objection was made, is limited to the ground assigned").

In any event, the argument lacks merit. The argument stems from defense counsel's proffer that Detective Turner was suspended for making a false report on his overtime reports. Although we recognize that proving that a witness is biased, prejudiced, or has a motive to testify falsely are proper methods of attacking the credibility of the witness, *see* Rule 5–616(a)(4), we can not conclude, on this record, that the trial judge abused his discretion in ruling as he did. *See Oken v. State*, 327 Md. 628, 669, 612 A.2d 258 (1992) (scope of examination of witnesses matter of trial court discretion); *see also Marshall, supra*, 346 Md. at 192–97, 695 A.2d 184 (noting that even a defendant's right to cross-examine and confront witness is not without limits); *Thomas v. State*, 143 Md.App. 97, 109–10, 792 A.2d 368 (2002) (the conduct of the trial "must of necessity rest largely in the control and discretion of the presiding judge") (quoting *Wilhelm, supra*, 272 Md. at 413, 326 A.2d 707). We also conclude that the cases the appellant relies upon for this portion of his argument are inapposite. *See Clark v. State*, 140 Md.App. 540, 604–05, 781 A.2d 913 (2001) (finding no error in court's ruling limiting cross-examination concerning witness's marijuana use); *Waldron v. State*, 62 Md.App. 686, 697–98, 491 A.2d 595 (1985) (in absence of proffer or "clear indication from [defense] counsel" sufficient to generate issue of witness bias, court did not err in foreclosing cross-examination of an important State's witness concerning whether her expenses and housing were paid by the State in return for her testimony); *cf. Johnson and Walters v. State*, 30 Md.App. 512, 520, 352 A.2d 371 (1976) (court erred in not permitting defendant to elicit the fact that a witness was under indictment or in police custody).

Moreover, although Detective Turner was an important witness for the State in what was otherwise primarily a circumstantial evidence case, we also conclude that any alleged error in limiting cross-examination was harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) (error will be harmless when reviewing court, upon independent review, is able to declare a belief beyond a reasonable doubt that there is no reasonable possibility that

the error contributed to the verdict); *see also Clark, supra,* 140 Md.App. at 565, 781 A.2d 913 (error for appellate purposes "may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling" (quoting Md. Rule 5–103(a)).

Even without the statement of Bernard Pratt, which was offered through Detective Turner, two witnesses, Harold Sessoms and Antoinette Calhoun, testified that they saw the appellant hitting the victim with a gun prior to the shooting. Further, although it appears these witnesses did not see the actual shooting, both witnesses, upon viewing a photographic array, identified the appellant as the gunman. Calhoun wrote on the back of the array that "Drew. He hit him. shot him." Sessoms wrote that "[t]he guy started beating the other man with the gun. Then I heard three gun shot. The guy then exited the Wolfe St. entrance." From this evidence, the jury reasonably could infer that the appellant hit the victim with a gun and then shot him, thus supporting the ultimate convictions in this case of first-degree assault, use of a handgun in a crime of violence, wearing, carrying or transporting a handgun, and illegal possession of a regulated firearm. Accordingly, any error in limiting the appellant's cross-examination of Detective Turner was harmless beyond a reasonable doubt.

## IV.

Finally, the appellant argues that his sentence for wearing, carrying, or transporting a handgun pursuant to Section 4–203 of the Criminal Law Article should merge with his sentence for use of a handgun in commission of a crime of violence pursuant to Section 4–204 of the Criminal Law Article. The State agrees and so do we.

In *Wilkins v. State,* 343 Md. 444, 682 A.2d 247 (1996) (per curiam), the Court of Appeals stated:

In *Hunt v. State,* 312 Md. 494, 510, 540 A.2d 1125, 1133 (1988), we held that the Legislature did not intend that a separate punishment should be imposed for carrying, wearing, or transporting a handgun in addition to that imposed

for using a handgun during commission of a felony or crime of violence. We took the position that the sentence for carrying, wearing, or transporting the handgun should merge into the sentence for using the handgun during the commission of a felony or crime of violence. In *Hunt,* the separate sentence for wearing, carrying, or transporting a handgun was held to be illegal, and we vacated it.

*Wilkins,* 343 Md. at 446–47, 682 A.2d 247.

Thus, we agree with the parties that the appellant's sentence for wearing, carrying or transporting a handgun merges and must be vacated.

**SENTENCE ON COUNT VI, WEARING, CARRYING OR TRANSPORTING A HANDGUN, VACATED; JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY OTHERWISE AFFIRMED. COSTS TO BE PAID THREE–QUARTERS BY APPELLANT AND ONE–QUARTER BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**