988 A.2d 1054

**Andrew HEIGHT**

v.

**STATE of Maryland.**

**No. 1021 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 2, 2010.

Michael R. Malloy (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Susannah E. Prucka (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

## ON REMAND

DEBORAH S. EYLER, Judge.

On November 16, 2009, the Court of Appeals filed its opinion in *Wright v. State,* No. 6, Sept. Term 2009, 411 Md. 503, 983 A.2d 519. That same day, the Court issued a *per curiam* order granting *certiorari* in the case at bar, summarily vacating this Court's affirmance of the appellant's convictions, and remanding the case to this Court for reconsideration in light of the *Wright* decision.[1]

---

1. In the case at bar, the appellant was convicted of first-degree assault; use of a handgun in the commission of a crime of violence; wearing, carrying, or transporting a handgun; and possession of a regulated firearm after having previously been convicted of a disqualifying crime. He was sentenced to 18 years in prison for the assault conviction, a

In *Wright*, the Court held that a *voir dire* process by which
a 50–member venire panel was read a series of 17 questions
and, after the questions all were posed, each potential juror
was brought to the bench to give the judge (and counsel)
information, if any, based upon the questions, did not effec-
tively ensure the defendant a fair and impartial jury, and
therefore violated his rights under the Sixth Amendment to
the United States Constitution and Article 21 of the Maryland
Declaration of Rights. The Court vacated the convictions (for
drug possession and distribution crimes) and remanded the
case to the circuit court for a new trial.

The *Wright* Court concluded that the method of *voir dire*
"strayed too close to the 'cursory' and 'unduly limited' tech-
niques that [it had] proscribed." 411 Md. at 508, 983 A.2d 519
(quoting *White v. State*, 374 Md. 232, 241, 821 A.2d 459 (2003)).
The Court pointed to one venire panel member's answer to a
question at the bench as illustrating a "systemic problem" of
"lack of proper comprehension" by panel members of the *voir
dire* procedure employed. That panel member had respond-
ed, in answer to the judge's inquiry whether she had heard the
questions he had asked, "Yeah, I—some of 'em." The Court
commented that this response was an example of "eviden[ce]
from the record that the trial court's questioning did not
properly engage at least some of the members of the venire
panel." *Id.* at 509, 983 A.2d 519

The Court in *Wright* concluded that the *voir dire* method
used was flawed because it required the panel members to
retain too much information for too long a period of time to
ensure that each member would remember and understand
the questions sufficiently to reveal any potential bias their

concurrent 10 years for the use of a handgun conviction, a concurrent
three years for the wearing conviction, and a concurrent five years
without the possibility of parole for the possession conviction. He was
acquitted of attempted first-degree and second-degree murder. The
charges arose from the shooting of Bernard Cure on March 15, 2005.
The underlying facts are set forth in our opinion at 185 Md.App. 317,
970 A.2d 921 (2009). We do not repeat them here, as they are not
pertinent to the reconsideration issue.

answers to the questions might reflect. In particular, the Court criticized the fact that the questions took five and one-half minutes to read to the venire; and that the individual interviews with each venire person then took almost 50 minutes to complete.

In the case at bar, the nine-page Jury Panel Roster shows that the venire panel consisted of 86 people. The "morning's" on-the-record proceedings started at 11:55 a.m. and ended at 2:01 p.m. The presiding judge began by telling the panel members he was going to pose a series of questions that they were not to answer right then; and that he would call each of them to the bench individually to give any affirmative answers they had to the questions. These introductory remarks took roughly seven minutes.[2] The judge then proceeded to pose a total of 15 questions. The questions were identical or virtually identical to 15 of the 17 questions posed to the venire in *Wright*.[3]

The first five questions concerned whether the potential jurors knew the defendant, any of the lawyers (giving names), or any of several witnesses who might testify (also giving names), and whether they knew anything about the facts of the case (which were briefly described). The next four questions sought information about the criminal/legal histories of potential jurors (and their close family members). The questions, slightly paraphrased, were whether the potential juror

---

**2.** From the times that appear in the transcript of the entire jury selection process, it is clear that each page of transcript comprised about one minute's worth of time.

**3.** The two questions posed by the court in *Wright* that were not posed by the judge in this case were:

1) "Has any member of the panel or any member of your immediate family had any other experience with the criminal justice system which would or might affect your ability to sit as a fair and impartial juror in this case?" and

2) "The accused in this case is African–American. Does any member of the panel feel that he or she is unable to reach a fair and impartial verdict simply because the accused is African–American?"

or a member of his or her family had been a victim of a crime? Had been convicted of a crime? Had been incarcerated in the last five years? Or had any pending cases?

The next four questions, which we also have paraphrased, were whether the potential jurors had a strong religious or moral belief against judging another human being? Had strong feelings about handguns?[4] Whether they or any immediate family members are/were employed by a law enforcement agency? And whether they would tend to believe or disbelieve the testimony of a police officer over that of a lay witness ("the police bias question")?

The second to last question informed the panel members that the trial was to last two days and asked whether that presented a problem for them. The last question was whether there was "any reason, whatsoever, : . . that you could not render a fair, and impartial verdict in this case based on the evidence, and the law as I instruct you?" ("the fair and impartial question").

It took the judge about five minutes to pose the 15 questions. After the judge noted for the record an objection that was made, argued, and denied at the start of the process, he called the panel members to the bench one-by-one and questioned each individually. That process began at about 12:07 p.m. The panel members were called by sequence number from the Juror Panel Roster, starting at the top of the first page, with panel member 1. The judge greeted each by name and asked: "Do you have information to give to the Court in response to the questions I've asked?" Of the 86 panel members, 56 answered "yes," either expressly or impliedly (by giving information), and 30 answered "no."[5]

---

**4.** In *Wright,* the correlative question concerned strong feelings about illegal drugs.

**5.** We are including as "no" answers one that was recorded as "inaudible" but when read in context appears to have been a "no", as well as one by an individual who had difficulty understanding English.

At the bench, the judge asked follow-up questions of every panel member. For those who responded "no" to his "Do you have information ..." question, he repeated the fair and impartial question (number 15 in the series), and sometimes posed a confirmatory follow-up to that question as well.[6] For those who responded "yes" to the "Do you have information ..." question, or simply proceeded to give information, he asked follow-up questions about the information and then repeated the fair and impartial question and sometimes a confirmatory follow-up to that. For example, for those people who reported that they or a family member had been the victim of a crime, or that they or a family member had been convicted of a crime, the judge obtained specific information about the crime, asked how the person or his or her family member had been treated by the criminal justice system and whether that would affect his or her ability to be fair and impartial, and repeated the police bias question. He then repeated the fair and impartial question and sometimes posed the follow-up to that question.

The Juror Panel Roster listed ten names per page. Strikes for cause were made and ruled upon at the end of each page. A total of 33 panel members (over 38%) were stricken for cause. The breakdown of reasons was as follows:

---

**6.** That exchange typically went as follows:

> THE COURT: Is there any reason you could not reach a fair, and impartial verdict in this case based on the evidence, and the law as I explain it?
> JUROR: No.
> THE COURT: Do you believe you could do that [ ]?
> JUROR: Mm-hmm ... Yes.

11 Cannot be fair and impartial (usually in follow-up to an experience with the criminal justice system. For example, one potential juror's brother was on death row for a crime the potential juror said the brother did not commit. One person's grandson had been murdered.).

8 Have religious or moral views against judging another human being.

6 Police bias, *i.e.*, would give more (or less) weight to the testimony of a police officer *vis-à-vis* that of a lay witness. (Some said more weight, some said less.)

4 Have strong feelings about guns (all voicing strong feelings against, and one going so far as to say that he would convict even if the defendant was not guilty based upon a handgun having been used).

1 Venire person said her mind was not working well and she would not make a good juror for that reason.

1 Venire person whose response to the judge's initial question at the bench made it clear she did not have a working understanding of the English language.

1 Venire person who was a convicted felon.

1 Venire person who was unable to attend the trial for medical reasons.

Counsel then made their peremptory strikes from the remaining 54 person venire panel. Twelve regular and two alternate jurors were selected and sworn and given preliminary instructions. At that point, it was 2:01 p.m., and the jurors were sent to lunch.

The Jury Panel Roster and the transcript of the jury selection process, read together, reflect that, of the 12 regular jurors ultimately selected, 7 were questioned at the bench between about 12:09 p.m. and 12:27 p.m. (within two to 20 minutes of the conclusion of the 15–question series); 3 were questioned at the bench shortly after 12:30 p.m. (actually, at 12:32, 12:33, and 12:34 p.m.); one was questioned at the bench at about 12:45 p.m., and the final juror was questioned at the bench at about 12:56 p.m. The last person selected as a

regular juror held sequence number 37. Thus, none of the last 49 panel members (out of the total of 86) became a member of the regular jury.[7] The longest period of time one of the regular jurors waited from the end of the 15 questions, at about 12:07 p.m., to being questioned herself was roughly 45 minutes.[8]

We have read the full transcript of the jury selection process in this case, and all other documents in the record that concern jury selection. No panel member said, indicated, or in any way suggested having any memory, confusion, or comprehension problem with respect to the series of 15 questions the judge posed to them.[9] There was no remark made by any juror, as there was in *Wright,* suggesting that the method of *voir dire* being used was creating a systemic problem. Many of the potential jurors answered "yes" to more than one question. Indeed, many of the jurors answered "yes" to broad interpretations of the questions. Many of the last 49 panel members, who were questioned latest and from whom none of the regular jurors was selected, answered "yes" to one or more of the 15 questions. Every potential juror, including all those saying they had no information to give in answer to the judge's questions, was asked the fair and impartial question, usually with a follow-up confirmation, as we have explained.[10]

---

**7.** The transcript contains many mistakes in typing the names of the various panel members. When the transcript and the Jury Panel Roster are read together, however, it is clear which panel member was called and questioned when.

**8.** The names of the first seven of the ultimately selected 12 sitting jurors appeared on the first two pages of the Jury Panel Roster. The next three appeared on page three of the roster and the last two appeared on page four. No one selected for regular jury duty appeared on the last five pages of the roster. (The two alternates were discharged at the end of the trial and did not participate in rendering the verdict.)

**9.** As noted, one panel member reported being generally confused; she was stricken for cause for that reason.

**10.** Thus, there was no need for any panel member to have remembered that particular question from the 15 questions read to them.

Because every potential juror was brought to the bench, the judge and counsel had an opportunity to assess the demeanor of each, individually, and close-up. Indeed, in making strikes for cause, the judge and counsel commented many times about the bearing and attitude of the various potential jurors. Also, because all potential jurors were brought to the bench, problems were uncovered that would not have been exposed had only those giving at least one positive answer to the 15 questions been called up. For example, the panel member who said her mind was not working well and she did not think she would make a good juror for that reason had answered "no" to the "Do you have any information ..." question. If the panel members had been selectively interviewed at the bench, based upon a showing of hands of "yes" answers, this person's comprehension problem might not have been detected. The *voir dire* questioning at the bench was not rushed and plainly was thorough.

As noted above, however, the jury selection process in the case at bar is virtually identical to that employed in *Wright,* and therefore cannot be distinguished factually. There is nothing in the record before us to support a conclusion that the jury selection process in this case *in fact* caused confusion, comprehension, or memory problems on the part of any potential juror so that any such juror did not give full answers to the questions posed by the judge. If actual prejudice were the standard, we would conclude that the *voir dire* as conducted by the presiding judge produced a fair and impartial jury, and we would affirm the judgments of conviction. Yet, as the *Wright* Court explained, the applicable standard of review does not probe for actual prejudice. It presumes, when jury selection has been conducted by the method employed in *Wright* and in the case at bar, that there *was* prejudice, *i.e.,* that at least one person ultimately selected to sit as a regular juror was not able to digest, recall, and answer the 15 questions posed by the judge so as to impart to the defense, during the interview at the bench, the information needed to make an informed jury selection. Precisely how it could be shown that it was not possible for at least one juror to have misunder-

stood or forgotten information responsive to one of the 15 questions is not clear. It *is* clear, however, that no such showing was made in this case. Therefore, following the precedent of the Court of Appeals in *Wright,* we must conclude that the jury selection process employed here was not constitutional, and we therefore must reverse the judgments of conviction.[11]

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THE COURT OF APPEALS'S HOLDING IN *WRIGHT V. STATE,* NO. 6, SEPT. TERM 2009 (FILED NOVEMBER 16, 2009). COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

11. In Maryland, there are civil and criminal rules governing jury selection (Rules 2–512, 4–312, and 4–313) but none that establish a set process for *voir dire.* Of course, the Court of Appeals has the power to adopt rules of that sort, should it desire to do so.