991 A.2d 122

**Rienaldo Bernard JAMES a/k/a James Rienaldo**

**v.**

**STATE of Maryland.**

**No. 0462 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

March 24, 2010.

236

Michael R. Malloy (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: SALMON,* MEREDITH and ZARNOCH, JJ.

MEREDITH, Judge.

A jury in the Circuit Court for Baltimore City convicted Rienaldo Bernard James, appellant, of first-degree assault, illegal possession of a firearm by a felon, use of a handgun in the commission of a crime of violence, and carrying a handgun.

---

* James P. Salmon, J., participated in the conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

**238**

On April 8, 2008, the trial court sentenced appellant to twenty-five years' incarceration for the first-degree assault, and a concurrent term of five years, without parole, for the illegal possession. The trial court also sentenced appellant to ten years in prison for the firearm use conviction, and suspended the execution of this term in favor of three years' probation. The count for carrying a firearm was merged.

Appellant raises three issues for our consideration, which we have recast as follows: [1]

1. Whether the trial judge committed plain error in the manner by which he conducted voir dire in the jury selection process.

2. Whether the trial court erred by denying appellant's motion to suppress identification testimony of one witness.

3. Whether the trial court abused its discretion by overruling the defendant's objection to a statement made during the prosecutor's rebuttal closing argument.

For the reasons set forth below, we shall affirm.

## BACKGROUND

This case arose from an altercation that took place on the evening of December 23, 2006, at the Hollinswood Inn, which is located in the 2800 block of Annapolis Road, Baltimore. Bobby Lewis Trent, who was a shooting victim that evening, testified that he went to the Hollinswood Inn with his cousin, Rico Blick. Trent had left work between 8 and 9 p.m., and he was joined by some friends at the Inn to drink and listen to music.

---

1. The questions presented by appellant were:
    1. Did the lower Court err, during jury selection, by asking all the voir dire questions at one time without taking any answers until after all the questions had been asked and by ineffectively eliciting the jurors' responses at the bench?
    2. Did the lower Court err by denying Appellant's motion to suppress the identification testimony of Rico Blick?
    3. Did the lower Court err by overruling Appellant's objection to the prosecutor's rebuttal argument to the jury?

Trent recalled that appellant—whom Trent identified in open court—walked into the Inn. According to Trent, appellant "started to get all loud[,]" and "[s]omehow" got into an altercation with Trent's cousin Tavon. During this disturbance, appellant struck one of Tavon's friends, and "took him [the friend] out of the bar." After the appellant "threw [Trent's] cousin's friend out of the bar," appellant came back inside "in a rage," and announced: "By the way, whoever don't know me my name is Rienaldo." Trent did not know appellant, had never seen him previously, and had never been to that bar before that night. On cross-examination, Trent revised his testimony and stated that appellant had exclaimed that his name was "Nardo."

Later in the evening, another altercation broke out in the bar. Trent was watching another cousin shoot pool when he noticed a "guy getting hit in the head with mad [sic] bottles, pool balls, anything." Appellant was involved in this affray, which Trent described as "chaos." Trent did not know who started the fight, but he added that appellant was, again, "in a rage." Trent suggested to his cousin, "Let's get out of here." Trent testified that he felt threatened, and as he left, he looked "Mr. Nardo in his eye" and said, "Man, I'm gone." As he looked back, Trent saw that appellant was holding a silver handgun.

Trent started running, fearing for his life as he heard gunfire. Trent testified that two men shot at him, although he could only see "Mr. Nardo, because I mean, his presence and the gun—it's plain and simple." Trent and one cousin were outside of the bar at this point, while another cousin had gone back inside to fetch his keys. When he saw the handgun, Trent started to run away, and was wounded by one of the "[m]ultiple shots" that were fired.

An ambulance responded, and Trent was rushed to the hospital. He spoke with a detective both during the trip to the hospital and while he was in his room. On December 26, 2006, while convalescing at the hospital, Trent viewed a photo array and, in a "split second," selected appellant's photograph.

He described the photo as that of the person who shot him. Trent admitted on cross-examination that he had consumed "like between four or five" beers that evening, but claimed that he was "focused to everything that happened that night."

One of Trent's cousins, Rico Blick, came forward as a surprise witness at trial. The appellant's objection to his testimony will be set forth more fully below. Blick testified that on the evening of December 23, 2006, his cousin Bobby Trent urged him to join him for a night out. At first, Blick was reluctant to go out, but Blick then suggested they go to the Hollinswood Inn, stating that he knew "one little chill spot where [he knew] won't be too much drama there[.]" Blick, Trent, Blick's brother-in-law, and two of Blick's co-workers went to Hollinswood Inn.

Once there, Blick and Trent had some drinks and shot some pool. Blick recalled that, after about a half hour, one of his co-workers came from "out of nowhere," approached Trent, and said "I'm about to get out of here, I think that guy right there, Mr. Nardo, I think he got a gun. So I'm just going to go ahead and leave." At this, "Mr. Nardo comes, loud boisterous, [and said] 'Don't be telling no more fucking body about who I am, they don't know me. You know what I mean, don't be telling nobody about me and nothing like that, matter a fact, roll out.'"

Blick's co-worker told them that he would just leave, and did so. The co-worker was "escorted" out of the bar by appellant. When appellant came back inside the bar, appellant announced: "If anybody don't know me my name is Nardo. This is how I get down, I gets down, my name is Nardo." This was followed by silence. The music stopped as everyone appeared to turn and focus on "Nardo." After a moment, some men at the bar said, "Okay, we know who you are, turn the music back on," and the music resumed. Trent told Blick that he felt uneasy about staying. Blick reassured his cousin, explaining that everything was calm, and Blick persuaded Trent to stay a while longer. After "half an hour,"

there was another commotion in the bar. Blick then agreed that they should leave.

Blick and Trent left the bar. Because Blick left his car keys inside, he returned to retrieve them from his brother-in-law who was still in the bar. When Blick came back out of the bar, Blick saw Trent running up the street. "Mr. Nardo and another gentlemen [were] standing in the middle of the street firing off at him, firing off at him." The gunmen then got into a car and "sped off." Meanwhile, Blick and his brother-in-law got into their vehicle and drove up to Trent. Trent, who had jumped over a "little bridge" in his efforts to avoid being shot, had suffered a gunshot wound to the leg.

Blick estimated that he stood from 10 to 30 feet away from appellant when the latter was shooting at Trent. He had not had any confrontations with "Mr. Nardo," but had noticed him "the majority of the night" he was in the bar.

When the prosecutor asked Blick whether he saw the shooter in court, defense counsel objected, and the trial court sustained the objection. The prosecutor moved on without securing Blick's explicit identification of appellant as the shooter.[2]

The State also presented the testimony of police officers who were involved in responding to, and investigating, the shooting. The State then moved into evidence a stipulation that appellant had previously been convicted of a crime that disqualified him from possessing a regulated firearm. Following the presentation of the State's case, the trial court denied the defendant's motion for judgments of acquittal.

Appellant testified in his defense, and also presented the testimony of Tavon Gwynn and Tiffany Rhue. Gwynn, appellant's friend, persuaded appellant to join Gwynn and Gwynn's brother Mark on a trip to the Hollinswood Inn. Gwynn testified that there was a confrontation between two different

---

**2.** The implication that appellant is "Mr. Nardo" is nonetheless clear from Blick's testimony. Blick had explained that he was in court "today . . . [for the] trial of Mr. Nardo."

groups, and that appellant stepped in to mediate. When one of the men in the bar asked his name, appellant responded that his name was "Nardo." After some men in the bar resisted appellant's attempts at mediation, appellant suggested that he and the Gwynns should leave. Tiffany Rhue corroborated Gwynn's recollection that appellant was a mediator, and testified that when she went to the Inn to purchase beer, she saw appellant trying to "defuse the situation" when an altercation took place. When someone questioned who appellant was, he replied "My name Nardo." Rhue denied that there had been any shooting in the bar when she had been there. Appellant's testimony also portrayed himself as a peacemaker, and he denied being involved in a shooting.

The renewed motion for judgment of acquittal was denied, and the case went to the jury.

We shall recite additional facts as they relate to the issues on appeal.

### DISCUSSION

### I. Voir Dire

■ Appellant challenges the trial court's method of conducting jury selection. He specifically asserts that the trial court's manner of asking the venire a series of preliminary questions constituted a "flawed voir dire procedure [that] interfered with the Appellant's right to a fair and impartial jury."

Appellant, citing *Dingle v. State*, 361 Md. 1, 759 A.2d 819 (2000), also complains that the trial court "compounded" the error posed by the collective questioning by asking individual jurors an improper follow-up query at the bench: whether the juror had "any information to give the Court in response to my questions[.]" Appellant claims that this follow-up query shifted the burden of judging a juror's partiality from the court to the prospective juror because it encouraged a juror's "self-assessment."

Acknowledging that trial counsel failed to contest the court's method of collective questioning, or, for that matter, any

aspect of voir dire, appellant asks this Court to notice plain error in the conduct of the voir dire. We decline to do so.

During the jury selection, the trial court posed a battery of questions to the prospective jurors. He introduced this inquiry as follows:

> I am going to ask all of you as a group some questions in order to obtain certain information which is necessary for the attorneys and for the court to determine whether you are eligible to serve as jurors in this case.

> Your legal requirement in responding to these questions is the same as if each of you individually took the witness stand and testified under oath, as indeed you are under oath.

* * *

> I emphasize that the fact you are questioned as a group does not lessen or lower your responsibility for making known your answers to these questions when you are given the opportunity to do so.

> Now, I will not ask you to stand or to respond in any way, as I ask the questions. Listen to all of the questions very carefully and after I have asked all of the questions I will bring each of you to the bench and you may provide your answers to the questions at that time.

The trial court then propounded thirteen questions, after which he asked counsel whether there was "any problem with voir dire." Defense counsel specifically responded: "No objections." Following this questioning, the trial court called each prospective juror to the bench one at a time, and asked whether the prospective juror had any information in response to the court's questions, and whether there was any reason why that person could not be fair or impartial. After jury selection, both counsel expressed satisfaction with the jury that had been selected. Defense counsel stated affirmatively: "The panel is acceptable to the defense." [3]

---

3. During closing argument, defense counsel made positive comments about jury selection in this case:

Subsequent to the trial in this case, the Court of Appeals disapproved of a voir dire procedure that employs collective questioning with delayed answers, as that technique was used in the case before us. In *Wright v. State,* 411 Md. 503, 506, 983 A.2d 519 (2009), the Court held that "this method of voir dire did not effectively ensure a fair and impartial jury[.]" Writing for the Court, Judge Sally D. Adkins explained:

The sheer bulk of the voir dire questions helps illustrate the difficulty of the task required of the venire. The form of the presentation further compounded that difficulty: the voir dire comprised five and a half minutes of continuous questioning, without pause, after which each venireperson was called to the bench one at a time. This process resulted in substantial delay between presentation of the questions and the answers. Of the twelve jury members ultimately seated, four approached the bench more than thirty minutes after the voir dire questions had been read; the last of these approached more than fifty minutes after the reading.

*Id.* at 511–12, 983 A.2d 519.

Based upon its ruling in *Wright,* the Court of Appeals, in *Height v. State,* 411 Md. 662, 984 A.2d 871, (2009) (per curiam), vacated this Court's decision in *Height v. State,* 185 Md.App. 317, 970 A.2d 921 (2009), in which we had held that the same method employed by the trial court to conduct voir dire did not constitute an abuse of discretion. Upon remand, constrained by the holding in *Wright,* we reversed the judgment in Height's case and remanded for further proceedings. *Height v. State,* 190 Md.App. 322, 988 A.2d 1054 (2010).

But, unlike the present case, defense counsel in *Wright* expressly objected to the method by which the trial court conducted voir dire. The Court of Appeals described how the

---

Our system of justice in this country is a cautionary cautious system of justice. Every citizen gets the benefit of that cautionary system of justice. What's that mean? Well on Friday, we took a lot of caution and a lot of time picking a jury. So we can pick a fair and impartial jury. That's the whole idea. That's why we asked you all those questions and bring all these people in (indiscernible), so we do the cautious thing, we do the right thing.

issue was preserved in *Wright*, 411 Md. at 506–07, 983 A.2d 519:

> At the end of this collective questioning, each venireperson was called to the bench individually and asked if he or she had any information in response to the voir dire questions. The court then asked the venireperson if he or she could be fair and impartial. At the conclusion of this process, ... Wright's counsel objected to this voir dire method, arguing that "the problem is [the jurors' abilities] to remember all the questions." The trial court overruled the objection, saying that in the court's understanding, the chosen method "complie[d] with ... reported cases." The trial court went on to say that "this is an extremely effective way of accomplishing what is sought to be accomplished in the voir dire process. The jurors do remember the questions."

Similarly, during the trial in Height's case, the defendant raised a specific objection to the practice of deferring the opportunity for prospective jurors to respond to each question. As we recounted in our first *Height* opinion, 185 Md.App. at 328–29, 970 A.2d 921, as soon as the trial court announced the process he intended to follow,

> defense counsel asked to approach the bench. He objected to the procedure of asking "the questions all as a group instead of having to stand up after each question so that we can write down the number ... [as it e]nds up being confusing to the jurors...." Defense counsel further argued that another case was pending on appeal dealing with this same issue and, therefore, "I would be objecting for the record asking if you could question and then bringing them up based on the fact that it would be confusing." The court denied the request, remarking that, until the Maryland appellate courts have held otherwise, "I don't have any reason to depart from the procedure that I've adopted."

(Footnote omitted.)

In contrast to *Wright* and *Height*, defense counsel in the present case not only failed to object to the method of voir

dire questioning, but also affirmatively stated that he had no objection to the voir dire, and that the jury panel that had been selected was acceptable. Accordingly, the issue is not preserved for our review, and we would only consider appellant's arguments if we viewed the trial court's methodology as plain error that we should address even though unpreserved. It is not.[4]

It is clear that, "when a defendant fails to object [to the actions of the trial court], an appellate court possesses plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." *McMillan v. State*, 181 Md.App. 298, 359, 956 A.2d 716 (citation and internal quotation marks omitted), *cert. granted*, 406 Md. 744, 962 A.2d 370 (2008). But an appellate court should "intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial." *Richmond v. State*, 330 Md. 223, 236, 623 A.2d 630 (1993) (citations and internal quotation marks omitted). Even in cases where the error may be deemed to be "reversible," we have "reserve[d] our discretion to exercise plain error review for instances when the unobjected to error

---

**4.** We note that the *Wright* Court did not condemn the practice of asking all questions up front and then questioning the jurors more thoroughly at the bench. The primary problem identified in *Wright* was the *delay* between the questions and responses. The Court stated, 411 Md. at 514, 983 A.2d 519:

We are not suggesting that asking questions to a venire panel en masse is an inherently flawed procedure. In this case, it is the multiplicity of the questions that is problematic, not the means by which the questions are broadcast. The key to an effective voir dire is allowing venirepersons the meaningful opportunity to digest the individual questions posed to them and to respond fully to each one while the question is at the forefront of their minds.

For example, as is frequently done, the trial court may address a question to the venire as a whole, and then allow the panel members to respond to that individual question through a show of hands before moving on to the next one. The trial judge or the court clerk could make notes of which juror responded affirmatively to each question, and after all questions are completed, call those jurors who made an affirmative response to the bench for further inquiry.

is 'compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.' " *Stone v. State*, 178 Md. App. 428, 451, 941 A.2d 1238 (2008) (quoting *State v. Brady*, 393 Md. 502, 506–07, 903 A.2d 870 (2006) (further citation omitted)). It is only " 'the extraordinary error and not the routine error that will cause us to exercise the extraordinary prerogative [of reviewing plain error].' " *Martin v. State*, 165 Md.App. 189, 195, 885 A.2d 339 (2005) (quoting *Williams v. State*, 34 Md.App. 206, 212, 366 A.2d 399 (1976) (Moylan, J., concurring)), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006).

We decline to exercise our discretion in this case to notice plain error in the trial court's voir dire. Although an appellate court may address an unpreserved issue to "communicate a desired message to the bench and bar that might otherwise go unsent," *McMillan*, 181 Md.App. at 360, 956 A.2d 716, the Court of Appeals has already spoken clearly in *Wright*, obviating the need for further appellate exploration of this issue. Furthermore, the "error" of which appellant complains was not "plain" at the time of trial in this case. *Cf. Height*, 185 Md.App. at 332–33, 970 A.2d 921 ("it has been held consistently that there is nothing improper about a trial judge's questioning prospective jurors as a group."). An error would not be "plain" unless it is wrong under current law. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). At the time of the trial in the case before us, Maryland's appellate courts had yet to address whether the manner in which the voir dire was conducted was error. No extraordinary circumstances are present in the case before us to invoke our discretion to address an unpreserved claim of error that has since been addressed by the Court of Appeals.

## II. Witness Identification

Appellant asserts that the trial court erred by denying the defense motion to suppress the identification testimony of Rico Blick, the shooting victim's cousin. On the morning of the second trial day, the prosecutor announced that Blick had unexpectedly arrived at the prosecutor's office and the State

wished to present his testimony at trial. Defense counsel objected, claiming that Blick had not been named as a witness in discovery, and asserting that "some 14 months later the State decides they want to bring in this witness[.]" The prosecutor pointed out that Blick's name had been listed in the charging document, but prior to trial, Blick had neither identified appellant nor given a statement.

The trial court overruled the defendant's discovery objection to Blick's testimony, but with respect to possible identification testimony, the court ordered that a detective, with both counsel in attendance, conduct a photo array procedure outside the presence of the jury.

Defense counsel later informed the trial court of concerns that Blick had seen appellant in the courthouse in shackles. After the prosecutor confirmed that Blick had seen appellant, the trial court advised the State that it would appear that Blick's identification was "taint[ed]," and that the court would be inclined to grant the defendant's motion to preclude Blick's identification testimony. The trial judge granted the State's request for a hearing on the defendant's motion, but elaborated:

THE COURT: If you want a hearing on [defense counsel's] motion to suppress, we can have a hearing. I've already ruled that there is a sufficient issue of taint here to get beyond the Defendant's burden initially, and now it's the State's burden by clear and convincing evidence to convince me that the taint is overcome. I believe that's the standard, am I correct?

[DEFENSE COUNSEL]: That is correct, Your Honor.

The trial court conducted a hearing outside the presence of the jury to determine whether the State could call Blick as an identification witness at trial. At that suppression hearing, Blick testified that, on the night of the shooting, he accompanied his cousin, Bobby Trent, to the Hollinswood Inn. Blick recalled that they had been at the Inn perhaps 45 minutes when he "just heard a loud ruckus" involving one of Blick's coworker's. That person came up to Blick to complain about

appellant, and Blick's colleague suggested that appellant was armed. According to Blick, appellant approached, and took issue with the fact that Blick's friend had said something about him. Appellant then ordered that person to leave, and then escorted that person out of the Inn.

According to Blick, appellant then returned to the bar and announced: " 'Motherfuckers don't know me, I'm Nardo[.]' [B]roadcast his name. 'I'm Nardo, in case anybody don't know.' " Blick then recounted that, at this, the music stopped and everyone turned to appellant for a moment. Blick said that his cousin Trent felt uneasy about staying. Blick assured Trent that everything was now fine, and suggested that they finish their game of pool. But after another altercation erupted a while later, Blick agreed with Trent that they should leave.

After they came out of the bar, Blick remembered that he had left his keys with a cousin who had remained inside. Blick went back into the Inn to retrieve his keys. When he came outside the second time, Blick saw Trent running up the street away from appellant, who was standing in the street firing a handgun at Trent.

The prosecutor asked Blick how many times he had observed appellant on the evening of the incidents at the bar. Blick testified:

I mean, several times. Everybody's eyes was on him once he came broadcasting his name. You know what I mean, when he broadcast his name everybody was focused on him. Everybody, the whole bar. But I mean, I took (indiscernible) everything died down and we started shooting pool again everything resumed until a fight broke out in the back of the bar. In the back of the pool table was there. That's when everybody scattered.

Blick testified that he saw appellant in the courthouse on the morning of trial, and that he recognized him as soon as he saw appellant exit the elevator. This sighting occurred before Blick was shown the photograph array.

Blick asserted that he was able to see appellant shooting at his cousin, despite the fact that it was dark outside of the bar:

[PROSECUTOR:] ... Now how could you tell that the person doing the shooting was this Nardo person?

A How can I tell that he was doing the shooting?

Q Yes.

A I'm standing there watching him. I'm watching—I'm watching his face. Where I just pointed all that as far as where I'm right there standing at the corner by the end, I'm standing there watching him. I'm watching him as my cousin running up the street. I'm standing there watching him in the middle of the street firing off at him.

On cross-examination, Blick emphasized that he recognized the shooter in the courthouse not because he was being escorted in handcuffs and shackles, but because he "recognized his face." He did acknowledge, however, that he noticed appellant because of the restraints.

After hearing Blick's testimony and argument, the trial court denied the motion to suppress Blick's identification, ruling as follows:

THE COURT: ... I find based on the testimony that Mr. Blick did have a sufficient opportunity to see Mr. James on December 23rd, 2006 in the bar. Under the circumstances, again, if the jury believes the testimony that would focus any individual and in fact any individual in the bar on Mr. James, if that testimony is credible to the trier of fact, but he had a sufficient period of time and circumstances to see Mr. James. That causes me to think that his testimony is reliable with regard to the identification, and I rely in particular on the fact that I was persuaded when he said the first time on direct and without any leading or prompting that he recognized Mr. James immediately when he got off the elevator. And obviously, although it won't be obvious in the record of this case, any individual that gets off the elevator, while it is only perhaps 30 feet from the door of this courtroom, it's across the hall, and individuals who get off that elevator can turn left and go to any one of the three

or more courtrooms here, and it was not apparent at the time he recognized the Defendant that this was the Defendant in this case or that he was coming to go this particular courtroom.

That, in combination with all of the other testimony and the specificity of the testimony that Mr. Blick gave, causes me to conclude with sufficient certainty by clear and convincing evidence that this photo array was not tainted and will be admitted. Okay. Ready for the jury?

Maryland Rule 4–252(h)(2)(C) provides:

(C) If the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a defendant and in the exercise of its discretion, grants a supplemental hearing or a hearing de novo and rules otherwise. A pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or on appeal of a conviction.

In view of the fact that we find no merit in appellant's complaint about Blick, we shall assume, without deciding, that appellant did not waive his objection to Blick's identification testimony by producing witnesses in his own case who confirmed that appellant is known as "Nardo," and he was at the Hollinswood Inn on the night Trent was shot. *Cf. DeLeon v. State,* 407 Md. 16, 31, 962 A.2d 383 (2008) ("Objections [to evidence] are waived if, at another point during the trial, evidence on the same point is admitted without objection.").

▮ As an appellate court, in "reviewing the court's disposition of a motion to suppress, 'we look only to the record of the suppression hearing and do not consider the evidence admitted at trial.'" *Massey v. State,* 173 Md.App. 94, 100–01, 917 A.2d 1175 (2007) (quoting *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997)). *See Prioleau v. State,* 411 Md. 629, 638, 984 A.2d 851 (2009) (quoting *Rush v. State,* 403 Md. 68, 82–83, 939 A.2d 689 (2008)).

With respect to identification testimony, courts have recognized that " '[d]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial

identifications obtained through unnecessarily suggestive procedures.'" *Webster v. State,* 299 Md. 581, 599–600, 474 A.2d 1305 (1984) (quoting *Moore v. Illinois,* 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977)); *Gatewood v. State,* 158 Md.App. 458, 475, 857 A.2d 590 (2004), *aff'd on other grounds,* 388 Md. 526, 880 A.2d 322 (2005). Due process principles apply to remedy the unfairness that would result from the admission of evidence that is based on an identification procedure that was "unnecessarily suggestive" and conducive to misidentification at trial. *See Neil, Warden v. Biggers,* 409 U.S. 188, 197–98, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 299, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Jones v. State,* 395 Md. 97, 108, 909 A.2d 650 (2006).

Courts follow a two-step inquiry to determine the admissibility of disputed identification evidence alleged to be the product of unduly suggestive pre-trial identification procedures. *Gatewood,* 158 Md.App. at 475, 857 A.2d 590. The accused, in his challenge to such evidence, bears the initial burden of showing that the procedure employed to obtain the identification was unduly suggestive. *Id.* Once this showing is made, the court must then determine whether, based on the totality of the circumstances, the identification was reliable despite the suggestiveness of the confrontation procedure. *Biggers, supra,* 409 U.S. at 199, 93 S.Ct. 375. Although the reliability of the identification is the "linchpin" question, *see Manson, Correction Commissioner v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), if the identification procedure is not unduly suggestive, then our inquiry is at an end. *See Mendes v. State,* 146 Md.App. 23, 36, 806 A.2d 370, *cert. denied,* 372 Md. 134, 812 A.2d 289 (2002).

In the case before us, the State conceded that the courthouse sighting by Blick of appellant in shackles could make a subsequent request to identify the perpetrator unduly suggestive. Nevertheless, "not all impermissibly suggestive procedures call for exclusion [of the identification], but only those impermissibly suggestive procedures that would actually

give rise to a very substantial likelihood of irreparable misidentification." *Conyers v. State,* 115 Md.App. 114, 120, 691 A.2d 802, *cert. denied,* 346 Md. 371, 697 A.2d 111 (1997). If the identification is found by the court to be reliable, notwithstanding any suggestiveness in the identification procedures employed, it "is not a misidentification" and "will not be suppressed under the due process clause. What matters is the trustworthiness of the evidence, not the propriety of the governmental conduct that produced it." *Turner v. State,* 184 Md.App. 175, 181, 964 A.2d 695 (2009).

In *Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. 375, the Court set forth a "reliability" analysis to be followed if an identification procedure is deemed to have been suggestive. The trial court must then determine

> whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

In *Turner, supra,* 184 Md.App. at 183, 964 A.2d 695, we noted that the Supreme Court, in *Manson v. Brathwaite, supra,* 432 U.S. at 113, 97 S.Ct. 2243, "place[d] an unmistakable seal of approval" on *Biggers,* and "g[a]ve the *Biggers* test unchallenged authoritative legitimacy." As a consequence, we observed, 184 Md.App. at 184, 964 A.2d 695:

> It is only where there is "a very substantial likelihood of irreparable misidentification," to wit, a situation where the identification could not be found to be reliable, that exclusion would be warranted. Short of that point, the "evidence is for the jury to weigh."

(Quoting *Manson, supra,* 432 U.S. at 116, 97 S.Ct. 2243.)

With this background, we are satisfied that the trial court did not err by refusing to suppress Blick's testimony that

impliedly identified appellant as the shooter. "[U]nder all the circumstances of this case," there was no "substantial likelihood of irreparable misidentification." *Turner,* 184 Md.App. at 186, 964 A.2d 695 (citations omitted).

The trial court correctly emphasized Blick's ample opportunity to see appellant at the time of the events in question. Blick's co-worker had a confrontation with appellant that resulted in the co-worker being escorted from the bar by appellant. Blick saw appellant in the bar, and was there when appellant made himself the focus of attention by proclaiming that he was "Nardo." Blick got a good look at appellant while the latter was firing shots at Trent. These extensive opportunities for Blick to have observed the perpetrator at length on the night of the shooting strongly support a finding of reliability.

With respect to the second factor identified in *Biggers*—the witness's degree of attention—the testimony indicated that Blick focused on appellant as the latter was firing at Trent. Blick also concentrated on appellant during the events inside the bar, particularly when appellant demanded the attention of everyone in the bar. This factor weighs considerably in favor of reliability.

The third *Biggers* factor—the accuracy of the witness's prior description of the suspect—weighs in appellant's favor because Blick, who showed up at the prosecutor's door over a year after the crime, had previously offered no description to investigators.

With respect to the fourth factor identified in *Biggers*—the witness's level of certainty—Blick was not asked whether he was certain of his identification, and so did not expressly testify to a level of certainty. But Blick did not waver in his identification of appellant, even when vigorously cross-examined. Indeed, Blick emphasized on cross-examination that, while he was aware of appellant as a person in handcuffs and shackles, and his attention was drawn to a person in restraints, those restraints notwithstanding, "it's not that [he]

knew that [appellant] was the shooter because he was in handcuffs and shackles. [Blick] recognized his face."

The fifth factor identified in *Biggers*—the length of time between the event and the identification—could weigh against the reliability of Blick's identification because 14 months had passed between the crime and Blick's identification. Nevertheless, the strength of other factors, especially the first two, were sufficient, despite the delay, to support the trial judge's conclusion that Blick's testimony was sufficiently reliable to be admissible. *See Rodriguez v. Peters*, 63 F.3d 546, 557 (7th Cir.1995) (nine month delay); *United States v. Flores–Rivera*, 56 F.3d 319, 331 (1st Cir.1995) (seven-year interval between crime and identification; strength of other factors cited); *United States v. Drougas*, 748 F.2d 8, 28 (1st Cir.1984) (five-year interval). We consider to be instructive the following analysis of the impact of a lengthier interval by the United States Court of Appeals for the Seventh Circuit:

> Although the lineup followed the two bank robberies by 10 and 26 months, respectively, other indicia of reliability overcome the lapse in time as well as the alleged defects in the lineup procedures. The record reflects that the witnesses had ample opportunity to view Larkin during the bank robberies. At trial, several testified that they had paid close attention to the perpetrators, and that, in light of the trauma caused by the robberies, they could not easily forget Larkin's physical features.

*United States v. Larkin*, 978 F.2d 964, 970 (7th Cir.1992).

We conclude that the trial court did not err in denying appellant's motion to suppress Blick's identification testimony.

## III. Closing Argument

Appellant contends that the trial court erred by overruling one of his objections to the prosecutor's rebuttal argument. We are not persuaded, and conclude that the trial court did not abuse its discretion by overruling defense counsel's objection.

During the trial, Detective Shawn Reichenberg was called by the State and testified that Detective Robert Snead was the "lead detective" in this investigation. Reichenberg explained that Snead had not responded to the crime scene and had not reported to the hospital to check on the victim because Snead was not on duty that evening. Snead was nevertheless designated the lead investigator on the case because of the normal rotation of duties. Reichenberg noted that, pursuant to this protocol, Snead was "the next one up in line[,]" and Snead reported a "couple hours later" when he was contacted by Reichenberg. Snead was present at trial but was not called as a witness by either side.

Defense counsel sought to exploit the fact that the "lead detective" in the case did not testify. The defendant's summation included the following comment:

> [DEFENSE COUNSEL:] I find it very interesting that the lead detective in this case was Detective Snead. The State has the burden of proof, but they didn't give you Detective Snead. Well, think about that. The lead detective isn't even called in an attempted murder case. There's got to be a reason for that, and that's your job to figure that out, not mine.

The prosecutor's rebuttal responded to counsel's challenge as follows:

> [PROSECUTOR]: . . . Detective Snead. Where's Detective Snead? Ladies and gentlemen, you heard all the evidence. You heard from Detective Reichenberg. Detective Snead got the case after the crime scene was over. We're not trying to hide Detective Snead, he's sitting right here. If I thought he would be useful, I would have called him, but you already heard all the evidence. He's not going to change the fact that Bobby Trent identified the Defendant as the person who shot him. He's not going to change Detective Reichenberg—

> [DEFENSE COUNSEL]: Objection, Your Honor.

> THE COURT: Sustained.

[DEFENSE COUNSEL]: I don't know what he's going to say.

[PROSECUTOR]: The defense is making a big deal as to there must be a reason why I'm not calling him. There's no reason, ladies and gentlemen. He's simply not needed.

[DEFENSE COUNSEL]: Objection, again.

THE COURT: Overruled.

[PROSECUTOR]: Those two witnesses, Bobby Trent and Rico Blick, identified Rienaldo James as the person who shot Bobby Trent on December 23rd, 2006, and that's it. And that's why the Defendant should be found guilty. Thank you.

In *Spain v. State*, 386 Md. 145, 152–53, 872 A.2d 25 (2005), the Court of Appeals quoted the following description of permissible closing arguments from *Degren v. State*, 352 Md. 400, 429–30, 722 A.2d 887 (1999) (internal quotations and citations omitted): "The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom." In both *Spain* and *Degren,* the Court of Appeals quoted from the following passage found in *Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707 (1974), relative to closing arguments:

Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the

eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

As a limitation upon the general scope of permissible closing argument this Court [has] cautioned that counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he could have proven. Persistence in such course of conduct may furnish good grounds for a new trial. The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party.

(Internal citations omitted.)

More recently, the Court of Appeals has observed similarly: "[C]ounsel may 'state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence,' . . . in addition to argue matters of common knowledge." *Smith & Mack v. State*, 388 Md. 468, 488, 880 A.2d 288 (2005) (quoting *Henry v. State*, 324 Md. 204, 230, 596 A.2d 1024 (1991)). Recognizing the importance of closing argument, the Court has "given attorneys wide latitude in the presentation of closing arguments, because '[s]ummation provides counsel with an opportunity to creatively mesh the diverse facets of trial, meld the evidence presented with plausible theories, and expose the deficiencies in his or her opponent's argument.'" *Lee v. State*, 405 Md. 148, 162, 950 A.2d 125 (2008) (quoting *Henry,* 324 Md. at 230, 596 A.2d 1024). But counsel may not "comment upon facts not in evidence or . . . state what he or she would have proven." *Smith and Mack, supra,* 388 Md. at 488, 880 A.2d 288. And, although prosecutors "are given 'great leeway' during opening and closing arguments[,]" they must "remain within the bounds of the evidence presented at trial and refrain from

appealing to the jury's passions and prejudices." *Lawson v. State,* 389 Md. 570, 608, 886 A.2d 876 (2005).

In this case, the trial court failed to sustain an objection to the prosecutor's remarks on rebuttal responding to defense counsel's argument that it was the jury's "job to figure out" the reason why the State did not call Detective Snead as a witness. As in *Mitchell v. State,* 408 Md. 368, 383–84, 969 A.2d 989 (2009), defense counsel's closing argument did not improperly comment on the fact that Detective Snead failed to testify. "[I]t is within the scope of permissible argument for counsel to draw inferences from the evidence admitted at trial, which includes the ability to comment on the absence of such evidence." *Id.* Consequently, we do not consider whether the "invited response" doctrine applies to this case. *Id.*

Nevertheless, as the Court of Appeals explained in *Mitchell,* defense counsel's argument that "[t]here's got to be a reason" that Snead was not called " 'opened the door' for the prosecutor to offer an explanation as to why [that witness was] not present." *Id.* at 389, 969 A.2d 989. The prosecutor's explanation of his tactical decision not to call an additional witness was a "tailored response" to defense counsel's unsupported innuendo that there was some nefarious explanation for the prosecutor's failure to put Snead on the witness stand. *See Mitchell,* 408 Md. at 389, 969 A.2d 989. Defense counsel's argument effectively "opened the door" for the State to explain very succinctly, and without placing before the jury any facts not in evidence, that the prosecutor simply made a decision not to call that witness.

In cases in which the defense counsel's argument opens the door for a prosecutor's response, just how wide that door is opened must be determined, in the first instance by the trial judge, on a case by case basis. And prosecutors should not seek to turn a shield into a sword by going further than is necessary to respond fairly to the argument made by the defendant. The fact that a defendant's argument opened the door for a fair comment in response is not a license for the

prosecutor to testify on rebuttal. In this case, for example, the trial court properly sustained the objection asserted when the prosecutor began to inform the jury what Detective Snead's testimony would have been if called ("He's not going to change the fact that Bobby Trent identified the Defendant.... He's not going to change Detective Reichenberg....").

But, under the specific circumstances of this case, the trial judge did not abuse his discretion in overruling the objection to the prosecutor's assertion that there was no reason he did not call Detective Snead: "There's no reason, ladies and gentlemen. He's simply not needed." That was a permissible inference to be drawn from the evidence, and a fair response to defense counsel's argument. As the Court of Appeals stated with respect to a similar situation in *Mitchell, supra,* 408 Md. at 393, 969 A.2d 989: "Under the circumstances, the prosecutor's remarks during rebuttal argument constituted a reasonable reply to arguments made by defense counsel in closing argument. The trial judge did not abuse his discretion in allowing the State's rebuttal argument."

**JUDGMENTS AFFIRMED. APPELLANT TO PAY COSTS.**